John K. SHAMBURGER, Plaintiff,

v.

Shearn MOODY, Jr. and Empire Life Insurance Co. of America, Defendants,

Insuranceshares Corporation and the First National Bank in Little Rock, Arkansas, Intervenors.

No. LR–68–C–257.

United States District Court, E. D. Arkansas, W. D.

July 27, 1970.

John H. Haley, Little Rock, Ark., for plaintiff.

Edward L. Wright, Little Rock, Ark., A. R. Schwartz, Houston, Tex., for defendants.

Edward Lester, Little Rock, Ark., for intervenors.

## MEMORANDUM OPINION

HENLEY, Chief Judge.

This is a suit at law for damages for alleged breach of contract and fraud. Plaintiff contends that in April 1966 the defendants, Shearn Moody, Jr. and Empire Life Insurance Co. of America, entered into a binding contract to advance to plaintiff the sum of $364,000 on or before July 1, 1966; that they breached the contract, and that he was heavily damaged by the breach. Plaintiff contends also that the alleged conduct of

the defendants was fraudulent, and that they are liable to him for punitive as well as for compensatory damages. Defendants deny all liability.

An intervention has been filed by Insurance shares Corporation of Little Rock, Arkansas, and by The First National Bank in Little Rock; the intervenors in general align themselves with the plaintiff. Defendants deny that the intervention has any merit.

Federal diversity jurisdiction is not questioned and is established. The cause has been tried to the Court without a jury and has been briefed thoroughly. This Memorandum Opinion incorporates the Court's findings of fact and conclusions of law.

There is really not much dispute as to what the facts in the case are or as to what the parties involved did, said, and wrote. While the facts are not actually "controverted," they are "controversial" as far as inferences to be drawn from them are concerned, and the operative acts and statements of the parties are in certain respects ambiguous. In such circumstances the Court deems it well to set out the facts in considerable detail and to compartmentalize to some extent the statement of facts.

### The Parties Introduced

The case involves principally two individuals and four corporations. At least two other persons are subsidiarily involved. The relevant period of time begins in 1965 and extends generally through 1968.

1. *The Plaintiff, John K. Shamburger.* John K. Shamburger is a Little Rock lawyer who has specialized down through the years in the formation, financing, and management of life insurance companies. He is considered knowledgeable in the fields of forming and organizing insurance companies, the issuance of insurance company securities, the acquisition of control of corporations, and the mergers of corporations.

2. *Republic Investors Life Insurance Co. (Republic).* Republic during the suit period was an Illinois life insurance company authorized to do business and doing business in Arkansas. It had approximately 5,000,000 shares of stock authorized and issued. Much of that stock was publicly held, but there were substantial blocks of stock in single ownerships.

One of those blocks, a very substantial one, was owned by Shamburger. He owned 28,812 shares for which he had paid about $1 per share, and he had an option to purchase 112,450 more shares for $1 per share. That option had to be exercised by mid-September 1966 if at all.

Shamburger was a member of Republic's Board of Directors, and he was also the Arkansas attorney for Republic. In the latter capacity he had an employment contract with Republic under which he was to be paid not less than $7,500 per year for his legal services.

Another substantial block of stock was owned by *Glen A. Jordan* who in 1966 was the Chairman of the Board, Director, and Acting President of Republic.

3. *Empire Life Insurance Co. of America (Empire), a Defendant Herein.* Empire is an Alabama insurance company authorized to do business in Arkansas; its principal place of business is in Texas. During the period with which the Court is concerned it was governed by a Board of Directors consisting of 15 members.

There were two classes of outstanding stock in Empire. Class A stock which generally was non-voting stock; however the owners of Class A stock were entitled collectively to elect one member of the Board of Directors. Class B stock which was in general the voting stock of the company.

4. *The Individual Defendant, Shearn Moody, Jr.* Shearn Moody, Jr. is a multi-millionaire Texan largely interested in the life insurance business and in the acquisition and merger of life insurance companies.

During 1966 he owned all of the Class B stock of Empire and thus was able to

elect 14 of that company's 15 directors. In addition to his stock ownership he was Chairman of the company's Board of Directors, its President, and its Chief Executive Officer.

Throughout the relevant period Moody had a number of attorneys and assistants including *Dale Major*, a lawyer who was a member of Empire's Board.

5. *The First National Bank in Little Rock, Arkansas (the Bank)*. Intervenor, The First National Bank in Little Rock, Arkansas, is a national banking association domiciled in the City the name of which it bears. Its interest in this case arises from the fact that in 1965 it had extended to Shamburger a line of credit not to exceed $250,000 and had actually advanced him about $239,000.

Shamburger's obligation to the Bank was evidenced by a note payable on July 1, 1966. That note was secured by a pledge to the Bank of Shamburger's employment contract with Republic, his shares of Republic stock, his option to buy additional shares at $1 per share, and miscellaneous securities of little value.

6. *Insuranceshares Corporation (Insuranceshares)*. Insuranceshares, an intervenor herein, is an Arkansas corporation which came into the case because for a fee of $10,000 paid by Shamburger it had guaranteed his obligation to the Bank and had deposited additional securities with the Bank to insure its ability to perform its contract of guaranty.

### The Gensis Of Controversy

This litigation grows out of the fact that in late 1965 or very early 1966 Moody determined that he would undertake to acquire control of Republic with the end in view of probably, although not inevitably, merging it into Empire.

In order to accomplish that purpose, it was important to Moody to acquire control of the Shamburger holdings and the Jordan holdings. And to succeed ultimately it would be necessary for him either to buy a large number of publicly held shares or to secure proxies from the owners of such shares. He decided to solicit proxies rather than buy publicly held shares on the market.

Moody undertook to acquire control of the Shamburger and Jordan holdings, and it was his hope that with those holdings plus such proxies as he could obtain he would be able to elect a majority of the members of Republic's Board of Directors at Republic's annual stockholders' meeting that was to be held in Little Rock on May 5, 1966.

The Jordan stock was acquired by Moody and was ultimately passed on to Empire. The details of the transaction, which were somewhat complicated and roundabout, need not be stated here. It is sufficient to say that Jordan was paid a very substantial premium for his Republic shares, and he also was issued a number of shares of Class A stock of Empire. The transactions with Jordan were consummated without incident in April 1966, and he passes out of the picture.

The controversy with which the Court is concerned involves the Shamburger interests, existing and potential, in Republic. Moody's plans with respect to the Shamburger holdings will now be described.

### Moody's Plan For the Shamburger Interests

Considerable negotiations involving the Shamburger interests took place. Under the plan finally agreed upon the Shamburger interests were not to be bought outright as were the Jordan shares. Rather, an advance of money was to be made to Shamburger which advance may be characterized either as a purchase of the shares from Shamburger but with him having an option of retaining them, or as a loan of money to Shamburger to be secured by a pledge of his Republic holdings, the loan being dischargeable at Shamburger's option simply by surrendering his interest in the pledged collateral.

Regardless of the ultimate characterization accorded to it, the transaction

was to take initial form as a loan to Shamburger on the basis of $2.60 per share for not more than 140,000 shares of Republic stock. Shamburger refers to the transaction as being one of "call, put or take." Should the loan be "called," Shamburger was to have the option of "taking up the call" by paying the loan or of discharging his obligation by "putting" the securities to the lender or lenders.

In 1966 Republic stock was not listed or traded on any stock exchange, but it did have an over the counter market value substantially in excess of the $1 per share for which Shamburger had acquired it or could acquire it; but that over the counter value was far less than $2.60 per share and probably was somewhat less than $2 per share at the time with which the Court is concerned at the moment.

The so-called loan was to be disbursed to Shamburger not later than July 1, 1966, the date on which his note to the Bank fell due. With the proceeds of the loan amounting to $364,000, Shamburger would have been able to pay the Bank in full and exercise his stock option. He would thus emerge as the owner of 142,832 shares of Republic stock (28,832 shares owned originally plus the right to buy 114,000 more shares), subject to his obligation to pledge 140,000 of them in connection with the Moody loan transaction.

Shamburger's participation in Moody's plan to secure control of Republic involved more than the contemplated stock transaction thus described. Shamburger was to cooperate actively with Moody in the proxy fight which was anticipated and which Moody had to win if he was to gain control of Republic. That involved a good deal of activity on the part of Shamburger and it required him to sever his connection with Republic and to surrender his employment contract.

Attention is called to the fact that the obligations running to Shamburger in connection with his stock and stock op-tions were not in anywise contingent upon the ultimate success of Moody in his design on Republic. However, it was contemplated that if Moody did obtain control of Republic, and if Republic should be merged into Empire, Shamburger would receive an additional benefit. Should the merger take place, Shamburger would be obligated to sell to Empire and Empire would be obligated to buy from Shamburger all of his Republic shares. Payment for the shares was to take the form of a paid up annuity based ultimately on a $5 per share value of the Republic shares.

### Release Of The Employment Contract From Pledge

As stated, Shamburger's contemplated cooperation with Moody in connection with control of Republic involved his giving up his employment contract with that concern, and it was necessary preliminarily for Shamburger to obtain from the Bank and Insuranceshares their consent to his abandoning his contract which was in pledge to the Bank. He obtained that consent without difficulty by outlining to the Bank and to Insuranceshares in a general way the contemplated loan to him of $2.60 per share on his stock and option.

### The Written Contract In Suit

This suit is based on a written contract document that was prepared in Moline, Illinois, and was executed by Shamburger and by Moody personally. That execution took place in Moline on April 8 or April 9, 1966.

The written instrument reflected the agreement heretofore described about the Shamburger stock and about Shamburger's cooperation in Moody's efforts to get control of Republic. However, although the original negotiations had contemplated a bipartite contract between Moody and Shamburger personally, the document was drawn as a tripartite agreement involving Empire as well as Moody and Shamburger.

In that connection the testimony establishes that Mr. Major participated in

the negotiations involving Moody and Shamburger, and that he insisted that Empire as a corporation become a party to the agreement. Shamburger was aware that Empire was being brought into the contractual picture, and in fact Shamburger helped prepare the written instrument.

After certain recitals as to Shamburger's situation which need not be set out here the contract provided:

"NOW, THEREFORE, in consideration of their mutual promises and benefits and in reliance hereon, the parties agree as follows:

1. Shearn Moody, Jr. and/or Empire agree to make or cause to be made to Shamburger on July 1, 1966, a fourteen (14) month loan at six per cent (6%) interest per annum. Moody and/or Empire agree to loan or cause to be loaned a maximum of Two Dollars and 60/100 ($2.60) per share on a maximum of One Hundred Forty Thousand (140,000) shares of Republic Investors Life Insurance Company stock.

2. Exclusive collateral for this loan will be Republic Investors Life Insurance Company stock. In the event of default, Moody, Empire, or other lender agree to look solely and exclusively to the Republic Investors Life Insurance Company stock pledged to satisfy said obligations.

3. Moody and/or Empire contemplate effecting a merger with one or more of their affiliated insurance companies or other life company or companies and Republic Investors Life Insurance Company. In the event any such merger is accomplished within two (2) years from the date hereof, Moody and/or Empire hereby agree, at the option of Shamburger to purchase up to a maximum of One Hundred Forty Thousand (140,000) shares of Republic Investors Life Insurance Company stock from him and to issue or cause to be issued in payment therefor, by a full capital legal reserve life insurance company acceptable to

Shamburger, an annuity policy, the immediate cash value (at time of issue) of which will be equal to Two Dollars and 50/100 ($2.50) times the number of Republic shares offered by Shamburger to procure such annuity and which shall have a matured cash value equal to Five Dollars ($5.00) times the number of shares offered by Shamburger to procure such annuity. The annuity shall mature fully within five (5) years from the date of its issuance. The value shall increase from the immediate cash value (at the time of issuance) each year twenty per cent (20%) and may be withdrawn by Shamburger at the rate of twenty per cent (20%) each year or left to accumulate at interest.

4. Shamburger agrees not to run for reelection as a director of Republic at its 1966 annual meeting of shareholders or at any adjournment thereof, and he further agrees to use his best efforts to elect and campaign and solicit proxies for a slate of directors designated by Moody.

5. Moody agrees that he will not permit the Republic common shares used to procure said annuity to be sold or offered for sale in the absence of an effective Registration Statement under the Securities Act of 1933 as to such securities or only after receipt of an opinion from counsel, satisfactory to Shamburger and Republic, that such Registration Statement is not required.

6. This Agreement shall be binding upon and shall inure to the benefit of and be enforceable by and against the parties hereto, their respective executors, administrators, representatives, heirs, legatees, successors, assignees and transferees of every kind.

7. This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois.

"IN WITNESS WHEREOF, the parties hereto have hereunto set their hands

and seals the day and year first above written.

/s/ John K. Shamburger (SEAL)

/s/ Shearn Moody, Jr. (SEAL)

EMPIRE LIFE INSURANCE COMPANY OF AMERICA

By ——————————————

Duly Authorized Officer"

The contract was supposed to be signed by Shamburger and Moody who did in fact sign it, and by a "duly authorized officer" of Empire. No such officer signed the document contemporaneously with Shamburger and Moody, and in fact it was never signed on behalf of Empire.

As to execution of the instrument on behalf of Empire, it was the understanding of all concerned, including Shamburger, that the contract would be submitted to Empire's Board of Directors for consideration at its next meeting which was to be held on April 12, 1966, three or four days after the document was signed by Shamburger and Moody.

### Shamburger's Performance Before April 12, 1966

Republic's Board of Directors met at Moline on the day upon which Shamburger and Moody signed the contract or on the following day. Both Shamburger and Jordan were present. In the course of the meeting Moody was elected President of Republic and Chairman of the Board. Thereafter, Shamburger and Jordan severed their connections with Republic, and Shamburger gave up his employment contract.

### The April 12 Meeting of Empire's Board

Empire's Board met on April 12. Moody and Major were both present, and presumably Moody was in the Chair. The Board considered both the Jordan transaction and the proposed contract with Shamburger. The contract with Jordan was approved unanimously and without difficulty.

The contract with Shamburger was not disapproved by the Board. It was approved subject, however, to a most important qualification, namely that it would become effective only if Moody should be successful in getting control of Republic at the stockholders' meeting to be held on May 5 something less than a month away.

No steps were taken at the time to notify Shamburger that this condition had been attached to the contract by Empire, nor was any new contract, incorporating the condition, prepared for submission to Shamburger.

On the other hand, it might be pointed out that Shamburger did not at the time try to find out what action had been taken by Empire's Board with respect to the contract, although he knew that the Board was meeting on April 12, and that the contract would be considered.

### Shamburger Between April 12 and May 5

Between April 12 and May 5, 1966, Shamburger continued his efforts in Moody's behalf soliciting proxies to be voted for the Moody slate of Republic directors. Those efforts had been commenced by Shamburger immediately after he had severed his connection with Republic. His efforts were in good faith and were diligent; he did all that was expected of him under his agreement, and no one contends to the contrary.

Plaintiff testified that he did not learn until June about the condition that the Board had attached to the contract. He concedes, however, that about May 1 Moody told him that the Board "would not go along" with the arrangement. However, Shamburger with Moody's knowledge continued to perform.

### Moody Between April 12 and May 5

Moody of course was active in his own behalf during the period above indicated, and, as stated, he informed Shamburger about May 1 that Empire's Board had not been willing to approve the contract.

However, the record reflects that on April 26, 1966, two weeks after the

Board meeting of April 18, he filed a "Schedule 14B" with the Securities & Exchange Commission dealing with the proposed acquisition of control of Republic, and on April 26 he filed an amended schedule. The original schedule is dated April 16, 1966; the amendment is dated April 25. Both the original schedule and the amendment contain the following statement about the Shamburger contract:

"On April 9, 1966, I and Empire Life Insurance Company of America entered into an agreement with John K. Shamburger, a director of the Company. The agreement provides that on July 1, 1966, either we will or we will cause a loan to be made to Mr. Shamburger for 14 months at interest of 6% per annum in an amount equal to $2.60 per share of the Company's common stock owned by Mr. Shamburger up to a maximum of 140,000 shares. Such shares will be sole security for the loan. The agreement, in addition, grants Mr. Shamburger the option of having, in the event that within 2 years from April 9, 1966, the Company shall be merged with a company controlled by me, either I or Empire Life Insurance Company purchase up to 140,000 of Mr. Shamburger's shares of the company with a full-paid 5-year annuity agreement, issued by an insurance company. At the time of issuance this annuity will have a present value of $2.50 per share and a matured value of $5.00 per share."

It will be observed that Moody's statement to the SEC does not reflect that Empire's Board had refused to approve the contract or had attached any condition to its approval of it.

### The Meeting of May 5

Republic's stockholders held their annual meeting as scheduled, and Shamburger was elected Chairman and presided. The contest for directors between the Moody faction and the faction in opposition to him was very close. Moody was able to elect three directors, but his opposition was able to elect four and so Moody's effort to acquire control failed at least for the time being. As will be seen later, however, Moody did not give up hope of acquiring control of Republic at a future time.

### Moody and Shamburger Between May 5 and July 1

The result of the May 5 stockholders' meeting meant, of course, that the condition attached to the Shamburger contract by Empire's Board could not be met, at least at the time, and Shamburger says that he learned of that condition on or about June 1.

He and Moody naturally had conversations about the situation between May 5 and July 1 when Shamburger's note to the Bank fell due and on or before which he was supposed to obtain the proceeds of the loan.

Prior to July 1 Shamburger was able to get an agreement for an extension of the time for the payment of his note which relieved him from immediate pressure from the Bank; this seems to have been known to Moody.

During this period of time and including July 1 Shamburger did not make any demand on Moody or Empire for disbursement of the loan. But, Moody never repudiated the arrangement; nor, on the other hand, did he ever reaffirm his or his corporation's obligation in so many words. Shamburger was reassured to some extent and was urged to "go along and not rock the boat."

### Shamburger And Empire's Board On August 31

It has been pointed out that Shamburger was required to exercise his Republic stock option by mid-September, 1966. On August 31 he appeared before Empire's Board seeking a "take-out" letter of some sort which would enable him to exercise his option and pay off the Bank. The record does not reflect the terms of the proposal made by Sham-

burger to the Board; probably, they were the same as or very close to the terms of the original contract; in any event, the Board after hearing Shamburger refused this request.

### Shamburger Exercises His Stock Option

Not having received any funds from either Moody or Empire, Shamburger was in danger of not being able to exercise his stock option. A failure on his part to do so would have damaged not only him but also the Bank since if the option was not exercised the Bank would lose the bulk of its security.

A partial solution to the problem was found that involved Shamburger, the Bank, and Arkansas Educators Investment Corporation, a concern that seems to have been controlled by Shamburger's law partner, Richard Pratt. The solution required the Bank to advance $105,-000 in additional funds to protect its security interest. That sum was loaned by the Bank to Arkansas Educators; Arkansas Educators in turn loaned it to Shamburger; Shamburger used it to acquire 105,000 shares of Republic stock; he pledged that stock to Arkansas Educators, and, finally, Arkansas Educators pledged it to the Bank.

That solution was expensive to Shamburger. He had to pay interest to Arkansas Educators, which had to pay interest to the Bank, and it was agreed that if the stock should be sold at a profit, Arkansas Educators would get one-third of it and Shamburger would get two-thirds.

The problem about the stock option having been solved, Shamburger was able to get a further extension of his Bank note until April 3, 1967; his obligation to Arkansas Educators fell due a few days before that date.

As far as the record shows, nothing further of any particular significance occurred during the balance of 1966. Things began to pick up again in 1967.

### Shamburger, Moody and Counsel For Insuranceshares, February 22 through April 5, 1967.

As the year 1967 opened, Shamburger began to be pressed with respect to his obligations, and he apparently began to become seriously concerned about his prospects.

On February 22 he wrote a long letter to Major reviewing the situation and making suggestions as to how Moody could obtain control of Republic. Basically, what he suggested was that Moody simply buy enough shares of Republic stock to obtain control of the company. He thought that the stock could be obtained quite cheaply.

That letter, which is some four pages long, is in the record as Defendants' Exhibit 1. It starts off with an expression of "affection and respect" for both Moody and Major and contains a further expression of his "complete appreciation for your understanding and cooperation." The Court has read that letter very carefully; it contains no assertion of liability on the part of Moody or Empire; on the other hand, it contains no disclaimer of any rights that Shamburger might have had.

On or prior to March 31 Shamburger had another conversation with Moody and asked him to write a letter to the Bank in connection with the rapidly approaching maturity date of Shamburger's note. Moody wrote the letter which appears as Intervenors' Exhibit 3, and the Court now quotes it in full:

"Mr. James B. Waddington,
 Vice President
First National Bank in Little Rock
3rd & Louisiana Street
Little Rock, Arkansas

Dear Mr. Waddington:

With respect to the Memorandum Agreement between John Shamburger and Shearn Moody—Empire Life of America dated April 9, 1966, we wish to advise that certain revisions are contemplated by our Company.

We would appreciate very much your taking no action with reference to the anticipated inability of John Shamburger to pay this loan in full Monday, April 3, 1967. Our Company contemplates some action with reference to Republic Investors Life Insurance Company and believe that our action will materially improve your collateral position with reference to this loan. Our Board meeting is scheduled for Monday, April 3, in Birmingham, Alabama. We will advise you by Thursday, April 6, concerning our action and request that you make no disposition of the Republic Investors shares pledged to you as collateral for the Shamburger loan. This represents the third largest block of stock in the Company and our interest therein would appear obvious. Thank you for your courtesy.

Very truly yours,

/s/ Shearn Moody, Jr.

Shearn Moody, Jr.

Chairman of the Board and President"

The Bank did not reply to that letter, but the Shamburger note was in fact extended again. On April 5 counsel for Insuranceshares wrote Moody referring to Moody's letter of March 31. In that letter counsel stated among other things:

"As you are aware, part of the additional security given the bank for its loan to Mr. Shamburger was a three-year employment contract between Mr. Shamburger and Republic Investors Life Insurance Company. Our client acquiesced in the relinquishment of this employment contract in order for Mr. Shamburger to fulfill certain obligations to you that he assumed.

"Our client has agreed to renewals of Mr. Shamburger's note to the bank. In taking this action, the existence of your Memorandum Agreement with Mr. Shamburger was certainly a significant consideration."

"This letter is to put you on formal notice that our client, Insurance Shares Corporation, considers that the Memorandum Agreement executed by you and Mr. Shamburger on April 9, 1966, constitutes a part of the security for its undertaking to the First National Bank in Little Rock. We trust that you understand the third-party interest of our client in this matter and why, without knowing any of the details, it would not be in a position to acquiesce in any changes or alterations in the Memorandum Agreement of April 9.

"Our client will make every effort to cooperate with both you and Mr. Shamburger, but we must insist that their rights be considered before any changes are made in the agreement of April 9. In this connection we would appreciate your advising either the writer or Walter M. Trulock III what action will be taken with respect to the Memorandum Agreement executed April 9."

That letter, to which, incidentally, Moody never replied, also suggests that the creditors of Shamburger would have no objection to a modification of the alleged Shamburger contract so as to provide that the basis of the loan to him would be $2 rather than $2.60 a share.

*The Controversy Comes To a Head*

On April 4, 1967, Shamburger wrote an important letter to Frank Newman, one of Moody's attorneys whose office is located in Dallas. That letter refers to the original contract and the "and/or" phraseology appearing therein and makes it clear that Shamburger was taking the position that Moody was bound personally regardless of whether Empire was bound. Shamburger went on to say, however, that he was willing to take $2 rather than $2.60 for his stock.

That letter brought about the confrontation between Shamburger and Moody that had not arisen during the period of almost a year that passed since the Republic stockholders' meeting in May 1966. And Newman and Moody both advised Shamburger that Moody denied any personal liability to Shamburger.

On April 7 Shamburger wrote Moody expressing "shock" at "receiving Mr. Newman's announcement and yours that you had no obligation to me." With that letter Shamburger enclosed a proposed contract substantially identical to the original 1966 contract, including the participation of Empire and the "and/or" phrase, except that it reduced the loan basis of the Republic stock to $2 per share and was related to the 1967 meeting of Republic's shareholders rather than to the 1966 meeting.

Moody never replied to that letter, and there is no evidence that Shamburger's latest proposal was even given any serious consideration by either Moody or Empire.

### Moody in Later 1967

On April 9, 1967, Moody sent out a memorandum to Mr. Newman and to a Mr. Riley reviewing the situation with respect to Republic. The view was expressed that it was imperative for Empire to get control of Republic before the existing management was able to put the company out of business which would involve a loss of all that Empire had put into it already. The letter contains the following paragraph relating to Shamburger and one Litton:

"Both Mr. Litton and Mr. Shamburger are large stockholders in this company and supposedly need $2.00 or better for their Republic Investors stock as they have both put this stock up as collateral for loans. Since this is considerably above the market and book values, I believe SEC-wise this could present a problem and economically, at this time, they are placing a terrific premium on their rather large minority stock interest without being able to deliver control. This would seem to be a bad investment except for the fact that we have $675,000 already tied up in the Company. If Litton & Shamburger desire to get more for their stock than book value from us, they should attempt to ride with us until we can effect control of the situ-

ation. Due to the necessity of their present position economically, every effort should be made to help them, if possible, at no more than a $1.50 per share for their 60 cent stock and only on a take out some two years off. We naturally would prefer not to have to do this."

A final 1967 item to be mentioned is a letter from Moody to Newman, dated November 10, which has this to say about Lytton (sic) and Shamburger:

"With respect to Messrs. Julius Lytton and John Shamburger, it is my desire and intention that Empire Life live up to its previous moral commitments to these gentlemen and plan to pay them by means of a paid-up life insurance policy, as previously discussed with them and agreed to by them. As an alternate suggestion, should they prefer, Empire could issue to them a retireable debenture, which I would like to equal at least $2.50 per share, plus 4% interest per share, which I sincerely feel Empire can and should come up with as this has been offered to us by General Life of America. I do not want to pursue this with either Mr. Lytton or Mr. Shamburger at this time, until we see how successful we are in accumulating Republic Investors stock from other shareholders; however, I feel very strongly that we morally owe Juley Lytton, at least, this amount if he continued to work with us as he has in the past year-and-a-half and as a result of his cooperation and support during the proxy fight in the spring of 1966."

### Commencement Of The Action and Final Liquidation of Shamburger's Republic Stock

Under date of August 28, 1968, Shamburger made full and formal demand on both Moody and Empire for performance of the April 1966 contract, and when it was not forthcoming this suit was filed on December 23, 1968. During the next few days the Republic shares held by the Bank were sold at a profit;

Shamburger's share of that profit was turned over to the Bank so as to reduce his obligation to a little more than $137,-000. Later payments have reduced it still further.

### Issues and Contentions

Having stated the facts of the case at full and perhaps tedious length, it becomes the duty of the Court to try to attach legal significance to those facts. It is desirable first, however, to define the issues and mention the contentions of the parties.

1. Does Shamburger have a claim against both Empire and Moody based on the April 1966 contract document?

2. If he does not have a claim against both defendants, does he have a claim against Moody personally?

3. Do the intervenors have a claim against either or both of the defendants independent of the Shamburger claim?

4. Assuming that one or both of the defendants are liable what is the measure of recovery?

The plaintiff contends primarily that he has a claim based on the April 1966 contract against both defendants. Alternatively, he says that he is entitled to recover against Moody alone. With respect to Empire plaintiff asserts that Moody had real or apparent authority to bind Empire to the 1966 contract without any action by the Board, and that the corporation became bound by virtue of Moody's alleged exercise of that authority. With respect to Moody personally, plaintiff contends that the contract was intended to be binding on Moody whether it was binding on Empire or not; he also contends that Moody is estopped from denying his liability.

The plaintiff's fraud theory is that the defendants "had no intention of honoring said agreement in the event that their efforts were unsuccessful in obtaining control of Republic's Board, using the agreement only as a tool to fraudulently obtain Plaintiff's resignation as an officer, Plaintiff's complete cooperation in the proxy solicitation, and Plain-

tiff's resignation as attorney and consultant to Republic."

It is perhaps needless to say that the defendants deny that they were guilty of any fraud. They also deny that they are liable for breach of contract. Empire says that it never became bound on the contract, and Moody says that since Empire did not become bound, he did not become bound personally.

Defendants contend earnestly that the conduct and writings of Shamburger prior to and after July 1, 1966, conclusively evidence a recognition on his part that he had no rights, contractual or otherwise, against either defendant, and that if he was to deal with Moody-Empire in reference to his Republic holdings, an entirely new contract would have to be negotiated and executed.

The claim of the intervenors is to some extent derivative from the claim of the plaintiff and much of intervenors' brief is devoted to supporting the proposition that Shamburger is entitled to prevail against the defendants. There seems to be no dispute at the present time between plaintiff and intervenors.

While the claim of intervenors is to some extent derivative, they advance a claim of their own under which they would be entitled to relief even if Shamburger is not. They say that they are entitled to recover as "third party beneficiaries" of the contract, and they say also that in granting extensions of time to Shamburger they relied to their detriment on acts and representations of the defendants.

### I. Plaintiff's Fraud Claim

To the extent that plaintiff relies on fraud in the tort sense of the term as a basis for recovery, the burden is upon him to establish fraud by a preponderance of clear, cogent, and convincing evidence. This he has not done.

The Court does not find even from a mere preponderance of the evidence that the defendants or their agents undertook to defraud plaintiff or to misrepresent anything to him or to over-

reach him. The plaintiff knew that the contract had not been executed on behalf of Empire, and he knew that it would be submitted to Empire's Board. That Board acted within its rights in refusing to approve the contract unconditionally, and there is nothing in this record that would justify any finding that in taking the action that it did with respect to the contract the Board acted otherwise than in good faith and in what it considered to be the best interest of the corporation.

The Court does not find that Moody's conduct after April 12 or after May 5, 1966, was tainted with fraud in the sense that the Court is now using the term. The Court will have more to say about that conduct, and about the conduct of the plaintiff, in the later portion of this Memorandum.

Since the Court does not find that the defendants were guilty of any fraud, plaintiff's claim for punitive damages simply goes out of the window. Actually, at the conclusion of the testimony and before considering the briefs the Court was convinced that this is not a case for punitive damages, and that claim will be rejected without any further discussion.

 What the Court has said about tortious fraud up to this point, however, is by no means dispositive of the issue of estoppel raised by plaintiff. That issue is very much in the case and will be reached in due course. A person can be estopped by his words or conduct from asserting certain things and still not be liable in damages for fraud and deceit.

## II. *Plaintiff's Claim Against Empire*

In the recent case of National Surety Corporation v. Inland Properties, Inc., E.D.Ark., 286 F.Supp. 173, aff'd 8 Cir., 416 F.2d 457, this Court had occasion to discuss in some detail the general law as to the real and apparent authority of agents, including corporate officers and executives. There is no occasion to repeat that discussion here.

 Assuming without deciding that Moody as Chairman of Empire's Board, its President, its Chief Executive Officer, and the owner of essentially all of its voting stock, had real or apparent authority to bind Empire to the terms of the 1966 contract without referring the matter to the corporate Board of Directors, it is clear to the Court that Moody did not purport to exercise any such authority, and that Shamburger knew that he was not doing so.

The Court has no doubt that Shamburger, knowing Moody's relationship to Empire, assumed that if the terms of the contract were satisfactory to Moody, they would be satisfactory to his Board, but Shamburger, an experienced lawyer, had no right to indulge in any such assumption. It is certainly not unheard of for a corporate board of directors to differ with even a controlling stockholder or senior officer of the corporation, and it is not unheard of for such a stockholder or officer to defer to the views of the board as a whole.

Neither did Shamburger have any right to assume that Moody would or legally could compel the Board to approve the contract. As a lawyer Shamburger must have known that a controlling stockholder cannot "compel" an existing board of directors to take any particular corporate action merely because he is a controlling stockholder, although he may employ stock ownership to change the make-up of the Board.

The Court thinks that it is possible that Shamburger exaggerated in his own mind Moody's control over his Board. Board minutes in evidence and testimony indicate that the Board members were not mere rubber stamps of Moody and that they in fact exercised their own independent judgment in dealing with corporate business. It is not to be overlooked, although it can easily be done, that while the Class B stock of Empire was totally owned by Moody, he did not own all of the Class A stock, and the directors had obligations to owners of Class A stock as well as to Moody.

Ultimately, though, the Court thinks that Shamburger simply did not care whether Empire was a party to the contract or not. The Court finds, and this is important not only here but elsewhere in the Court's thinking about the case, that Shamburger believed that irrespective of what Empire did or did not do, he had a binding contract with Moody, and that the loan would be made to him regardless of Empire's participation in the transaction. The money might come out of Empire's coffers, or it might come out of other funds available to Moody; the source of the money was not material to Shamburger.

### III. *Plaintiff's Claim Against Moody Alone*

The question of Moody's personal liability to Shamburger in view of the action taken by Empire relative to the contract is more difficult than is the question of Empire's liability to plaintiff.

It is true that in many cases a failure of one party to execute or become bound by a contract prevents parties signatory thereto from becoming bound as between or among themselves. That, however, is not invariably true.

■ If a contract not executed by all of the parties originally in contemplation is capable of being performed by those who do sign it, they may be bound inter sese. The contract itself may indicate that it is to be binding on those who sign although others do not sign; or the parties signatory may recognize their own obligations by performing; or one or more of them may be estopped to deny their own obligations.

As before indicated to some extent, the contract here in suit could have been performed by Shamburger and Moody without the participation of Empire; Empire's inclusion was an afterthought of Mr. Major. As stated, Shamburger thought that Moody was bound regardless of whether Empire should become bound.

Shamburger's idea that Moody was bound personally is certainly not negatived by the language of the written instrument including the use of "and/or." The use of "and/or" in legal documents has been the subject of discussion in many cases; it has been said to mean one thing; it has been said to mean another; it has been said to mean nothing. It is an ambiguous combination of a conjunctive and a disjunctive; it is a frequent source of controversy, as here; and careful writers can almost always, if not invariably, find better ways to express their thoughts and intentions. See the discussion of "and/or" appearing in Mellinkoff, The Language of the Law, Little, Brown & Co., pp. 147–152 and 307–310.

However unfortunate or ill advised the use of "and/or" in this contract was, it was not put in accidentally, and the Court is persuaded that it was intended to mean something. Bearing in mind the original plan that the contract would involve Shamburger and Moody only and that Empire was brought in as an afterthought, the Court thinks that a fair construction of the "and/or" term is that Shamburger was to get his loan in any event, either from Moody or from Empire, or from both.

Strength is lent to this view by the sentence in paragraph 2 of the contract which recites that in the event of default "Moody, Empire, or other lender" would look solely to the pledged stock for payment.

■ But, apart from the wording of the contract, the Court is persuaded that Moody is estopped from denying personal liability to Shamburger. That finding calls for some discussion.

It has been seen that Shamburger entered into the performance of the contract just as soon as it was executed, and with Moody's full knowledge changed his position substantially on the strength of the contract. Moody could hardly have supposed that Shamburger would participate in turning the management of Republic over to Moody and Major, would

resign his own directorship in the company, abandon his remunerative employment contract, and serve notice on the world of his allegiance to the Moody interest unless Shamburger was satisfied that there was a binding obligation in his favor. Since Shamburger knew that the contract had not yet been executed on behalf of Empire and since he was charged with knowledge that it might never be, his idea must have been that Moody was bound in praesenti in any event. To put is slightly different, Moody could hardly have supposed that Shamburger would do what he did if he thought that his compensation was dependent on Empire's approval of the transaction or on the outcome of the proxy fight which outcome, almost by definition, was doubtful.

Assuming that Moody thought that Empire would go along with the contract without objection, he knew on April 12, and Shamburger did not, that a condition that might never be met had been attached to Empire's obligation. With that knowledge he let Shamburger continue to perform until May 1 when he told Shamburger "casually" that Empire had refused to approve the contract. It is obvious that by that time Shamburger had crossed the Rubicon; he had to go on.

In view of the fact that Moody knew on April 12 that Shamburger was performing under the contract, elementary fairness dictated that Moody notify Shamburger at once as to the action taken by the Board and as to his own attitude about his own obligation, if he felt that he was not bound. The reason why Shamburger was not notified promptly seems evident. Shamburger's cooperation was absolutely essential if Moody's effort to get control of Republic was to succeed. In mid-April the stockholders' meeting was still nearly three weeks away; had Shamburger learned at so early a date what the Board had done and had he been told that Moody had gotten cold feet along with his Board, Shamburger would have had some options. By May 1 the die had been cast.

Nor did the information that Moody gave Shamburger on May 1 apprise the latter that Moody was denying or would deny his personal obligation to see to it that Shamburger received the loan from whatever source. In all the circumstances the Court is convinced that Shamburger had a right to assume that Moody would honor the obligation even if Empire did not participate, and to continue performance in reliance on that assumption, which he did.

Able counsel for the defendants argues that Shamburger's actions and writings after July 1, amount to a recognition on his part that he had no contract with either Moody or Empire, and that if he was to receive anything from the Moody interests, an entirely new contract would have to be negotiated. That argument is not without force, but the Court is not persuaded by it.

All that the conduct and writings of Shamburger after July 1 indicate to the Court is that Shamburger was in a desperate situation from a financial standpoint, that Moody was his only source of substantial funds, and that Shamburger was prepared to take less than $2.60 per share .for his Republic holdings. That attitude is not inconsistent with the idea that basically he was still contending that legally he was entitled to the full $2.60 per share.

It has been seen that after May 5 Moody was still interested in acquiring control of Republic, and he continued to need Shamburger's cooperation and vote. Hence, the two men after May 5 and after July 1 continued to need each other. While Shamburger did not affirmatively and positively assert his personal claim against Moody, Moody never denied the existence of the obligation until early April 1967, and even after he did so, he recognized a moral obligation to Shamburger and to the Mr. Litton or . Lytton who has been mentioned.

Men like Shamburger and Moody are nothing if not practical and flexible in their dealings. They had rather do business than engage in lawsuits. For that

reason they avoid needless controversies and prefer to take a soft line rather than a hard one if the soft line will produce satisfactory or at least acceptable results.

The controversy that came to a head in April 1967 was potentially in existence after the Empire Board took its action of April 12, 1966, although it would probably not have materialized had Moody won the proxy fight, as he very nearly did with Shamburger's help. Both Shamburger and Moody must have realized the potentiality of that controversy, and each side must have realized that its position had a degree of weakness.

An assertion by Shamburger at an early stage that he was claiming personal liability on the part of Moody might well have brought from Moody a denial of liability that had not been forthcoming. Conversely, an early positive statement by Moody that he was not bound might well have called forth from Shamburger an assertion of personal liability on Moody's part that had not yet been made in terms. Had such occurred, the potential controversy would have become real.

It seems to the Court that both men wanted to avoid that controversy and to that end avoided what evidently appeared to them to be a needless or undesirable confrontation. The final contract that Shamburger submitted to Moody in April 1967 was not anything in the Court's estimation but a firm offer in compromise which Moody chose not to accept.

The conduct of the parties which might have led to an amicable settlement of the entire matter was not in disfavor with the law although it may be said that their conduct has been productive of ambiguities which have been troublesome to the Court viewing the overall transaction ex post facto.

### IV. *The Claim Of The Intervenors Against The Defendants*

Since the Court is holding that Shamburger is entitled to recover against Moody, and since Moody seems unquestionably to be solvent, it would appear unnecessary at first blush for the Court to pass upon the validity of the independent claim of the intervenors against the respective defendants, particularly since there seems to be no controversy between Shamburger, on one hand, and the intervenors on the other.

If the Bank and Insuranceshares were the only creditors of Shamburger, the Court might find it unnecessary to pass on the claim of the intervenors, the theory being that they would share in the fruits of Shamburger's victory and might be paid in full out of his recovery against Moody. But, at the moment the Bank and Insuranceshares are simply general creditors of Shamburger, and the Court cannot assume that they are his only creditors. In the situation just outlined the Court considers it necessary to rule on the independent claim of the intervenors.

The claim of the intervenors is based on alternative theories, first, that the contract of April 1966 was executed in part for their benefit and that they are third party beneficiaries to which the defendants are independently obligated, and, second, that they granted extensions of time to Shamburger with respect to his note to the Bank in detrimental reliance on representations made by the defendants.

The intervention makes specific reference to two "Whereas" clauses appearing in the contract and which are as follows:

"WHEREAS, Shamburger is presently indebted to the First National Bank in Little Rock, Arkansas, in the approximate sum of Two Hundred Fifty Thousand Dollars ($250,000.00) on a note which becomes due July 7, 1966, and which loan is collateralized by certain shares of stock and subscription rights in Republic Investors Life Insurance Company of East Moline, Illinois, among other things; and,

"WHEREAS, Shamburger, because of the change in his position resulting

from the contemplated change in management is now uncertain as to his ability to satisfy this indebtedness on the due date."

And the intervention also makes specific reference to the Moody-Waddington letter of March 31, 1967. It is alleged that the Shamburger note was renewed on April 3, 1967, and that thereafter the Republic stock declined in value so that when the stock was finally sold, it did not bring enough to satisfy Shamburger's obligation.

The Court cannot accept either theory of the intervenors, and their claim will be rejected.

It is clear that the contract between Moody and Shamburger was not in any sense made for the benefit of the Bank and Insuranceshares although had the contract been performed they would have benefitted because in order to perform his obligations under the contract Shamburger would have been required to redeem the securities that he had in pledge, and he could do that only by paying the Bank. The two "Whereas" clauses in the contract served no purpose except to describe Shamburger's situation and to explain why he was willing to enter into the contract.

■ Turning to alleged detrimental reliance, it may be conceded that the intervenors agreed to Shamburger's surrender of his employment contract for the purpose of enabling him to perform his obligations to Moody, and, of course, had Shamburger had no obligations to Moody involving the employment contract there would have been no occasion for intervenors to agree to release it from pledge. In that sense, and in that sense only, it may be said that the intervenors agreed to the release of the employment contract "in reliance" on the agreement between Shamburger and Moody or between Shamburger and Moody and Empire.

■ But the mere fact that a creditor is willing to release an item of security to enable a debtor to perform a contract with a third party is not sufficient to impose liability on the third party for the secured debt.

Moreover, the Court thinks that it should be pointed out that when the Bank and Insurance shares agreed to release the employment contract, they really did not give up very much in the way of security, although the Court does not minimize the annual payments of Shamburger of not less than $7,500 per year, assuming that they were in fact being made to the Bank, a point concerning which the Court is not advised. The contract was a personal contract for professional services between an attorney and a client; it was not assignable, except to the extent that payments under it might be assigned. Had Shamburger died, or been disbarred, or had for some other reason become unable to serve as Republic's attorney, neither he nor his creditors would have had any rights under that contract. The Bank's real security with respect to the Shamburger debt was his stock, including stock rights, in Republic, plus the guaranty and the securities pledged by the guarantor. And the security of Insuranceshares was nothing more than what Shamburger had pledged to the Bank, plus what side collateral, if any, he may have pledged to Insuranceshares.

■ With respect to the extensions of time granted Shamburger by the Bank and Insuranceshares, or rather by the Bank with the consent of Insuranceshares, it may be said first that in granting the two 1966 extensions, one in July and the other in October, intervenors were probably influenced by the existence or the supposed existence of Shamburger's contract with Moody. But, those extensions were not granted at the request of Moody acting either personally or on behalf of Empire, and that is sufficient to dispose of the claim of intervenors to the extent that they may rely on those extensions.

Intervenors' claim is somewhat, but not much, more substantial to the extent that it is based on the Moody-Waddington letter of March 31, 1967. But, that letter falls far short in the Court's

estimation of amounting to such a request for a further extension of time for Shamburger as would impose any liability on Moody or Empire with respect to Shamburger's debt. Nor is the Court persuaded by the evidence that the Bank or Insuranceshares gave any particular weight to that letter when the Shamburger note was extended in April 1967.

The letter does not ask for any substantial extension of time or indeed for any extension of time. It simply asks that the Bank defer action with respect to the pledged stock until the meeting of Empire's Board on April 3, the same day on which Shamburger's note, as extended down to that time, fell due. The letter indicates that some "revisions" of the Shamburger contract were contemplated, but it does not state what those revisions were, and the intervenors never tried to find out. The letter stated also that the Bank would be advised not later than April 6 of the action taken, but the Bank was not so advised and did not ask for any information. The letter written to Moody on April 5, 1967, by counsel for Insuranceshares was but a self-serving declaration on behalf of Insuranceshares made after the obligation had been extended.

The intervention, which prays for judgment against the defendants, will be dismissed with prejudice.

## VI. *Compensatory Damages*

Plaintiff's claim for punitive damages having been rejected, there remains for consideration the question of compensatory damages. Disposition of that question is a three step process. First, the transaction must be characterized properly. Second, the measure of damages must be ascertained. And, third, a proper computation of the amount of recovery must be made.

Mention has been made of the fact that what may now be called the Shamburger-Moody contract may be considered either as a contract for a loan of money or as a contract for the sale and purchase of stock. In discussing liability it made little real difference which characterization was employed, but the matter of characterization becomes of the utmost importance as far as damages are concerned because upon that characterization depends the measure of damages.

 In view of the premium price per share which Moody was to advance on the stock, and in view of the fact that the advance was to be repaid only at the option of Shamburger, the Court concludes that at least for purposes of assessing damages the contract is to be construed as one for the sale of stock by Shamburger to Moody for $2.60 per share with performance due on July 1, 1966, or before that date. It follows that compensatory damages, apart from special or consequential damages, if any, are to be measured by reference to difference in market value.

Had Shamburger demanded performance on July 1, 1966, according to the terms and tenor of the contract and done nothing else, his damages would have been the difference between $2.60 per share and whatever the stock was worth per share on that date.

 As has been seen, however, Shamburger did not demand performance on July 1, 1966, or for a long time thereafter. He, therefore, is in no position to complain of damages resulting from mere "delay in performance." Shamburger held the stock, and it was finally sold on January 1, 1969. The Court will return to that sale in a moment; first, however, it is necessary to define what is meant by the term "stock" in talking about Moody's obligation to buy "stock" from Shamburger at the rate of $2.60 per share.

 It will be recalled that Shamburger actually owned only 28,812 shares of stock in Republic in April 1966, and had the right to purchase 112,450 additional shares at the rate of $1 per share. He actually exercised that right with respect to 105,000 shares, and upon the exercise of that right he became the

owner of 133,812 shares; his right to purchase 7,450 more shares was simply lost. The obligation of Moody was to buy not more than 140,000 shares of "stock."

Plaintiff contends that the 140,000 shares that Moody was required to buy included shares acquired by Shamburger as a result of his ultimate exercise of his stock purchase option. Moody contends that his obligation, if any, was limited to the 28,812 shares actually owned by Shamburger when the contract was made.

The Court resolves that particular subcontroversy in favor of the plaintiff. There is a close correspondence between the 140,000 shares which Moody was obligated to buy, and the number of shares that plaintiff would have owned upon the exercise of his option. It was the idea of the parties that Shamburger would use the proceeds of the advance or payment to him to redeem his pledged securities, exercise his option and pledge to Moody not more than 140,000 shares of stock. That object could not have been achieved and the reference to 140,000 shares of stock would have been without meaning had Moody's obligation been limited to 28,812 shares.

Plaintiff's Exhibit 5, which, the court accepts as accurate, is a settlement sheet which reflects the ultimate sale of the stock and the allocation of the proceeds. The stock was sold in two lots but apparently at the same time, and the Court has the impression that it was sold to the same purchaser. One lot of stock consisted of the 28,812 shares of stock that Shamburger owned in April 1966; that lot of stock was sold for a price of $67,089.70 or $2.33 per share, and all of the proceeds of that lot was applied to the principal of Shamburger's obligation to the Bank. The other lot consisted of the 105,000 shares that Shamburger had acquired in September 1966; it was sold for $194,-250.00 or $1.85 per share. The evidence does not clearly reflect why one lot of the stock sold for so much more than the other.

The proceeds of the sale of the 105,000 shares were allocated and disbursed as follows: $105,000 was used to discharge the principal of the loan made by Arkansas Educators; interest on that loan amounting to $15,830.21 was next paid. That left a "profit" of $73,419.-79; one-third of that profit was paid over to Arkansas Educators or its corporate successor, the amount of the payment being $24,473.26. The remaining two-thirds or $48,946.53 was allocated to Shamburger. That sum was applied first to the interest on the obligation owed to the Bank and then to the principal of that obligation. The interest amounted to $16,847.30 leaving $32,-099.23 to be applied to principal. The ultimate effect of the sale of all of the stock and the allocation of the proceeds was to reduce the principal obligation to the Bank to $137,270.41.

While that settlement sheet is instructive, it by no means solves the Court's problem of computation. The essence of that problem is that although the Court knows how much per share Moody agreed to pay for the stock and although the Court knows what the ultimate sale price of the stock was as of January 1, 1969, there is no satisfactory evidence as to what the stock was worth on July 1, 1966, or on any other particular date between then and January 1, 1969.

Notice may be taken of the fact that during the entire suit period life insurance stock was the subject of considerable speculation in Arkansas, although it was probably not so much so in late 1967 and throughout 1968 as it had been in prior years. Thus, the price of life insurance stock tended to fluctuate during the period; it would go up with favorable, earnings, reports, and rumors; conversely, it would go down when the atmosphere was bearish.

While the plaintiff talks about having mitigated his damages, and while it is probably fair to say that the stock sold for more at the end of 1968 than it would have brought two and a half years earlier, the Court cannot say with any

degree of specificity how much plaintiff's damages were mitigated by holding the stock as long as he did. For example, it might have brought more in mid-1968 than it did at the end of that year, and the Court notes in that connection that the intervenors alleged in their pleading that after about April 1, 1967, the stock declined substantially in value.

It should be kept in mind that plaintiff was holding his stock and the Bank was extending his obligation not for the benefit of Mr. Moody or to mitigate any damages that plaintiff might ultimately claim from Moody. The plaintiff was holding on in the hope of ultimately selling his stock to Moody at a premium, and the Bank was going along in the hope that plaintiff would finally get enough money from Moody or otherwise to pay off his note in full. And, of course, while the plaintiff held on, interest owed by him to the Bank and to Arkansas Educators continued to accrue. Had the stock been sold earlier than it was, the Arkansas Educators loan could have been liquidated and future interest on that loan eliminated and the obligation to the Bank could have been reduced at least to some extent.

As indicated, the evidence as to damages is not satisfactory, but the Court will do the best it can with the materials before it. The Court thinks that in view of all of the circumstances of the case plaintiff should be awarded the difference between what Moody was required to pay for 140,000 shares of stock and the ultimate selling price of the stock.

As to the $105,000 paid in satisfaction of the principal of the Arkansas Educators loan, it may be observed that plaintiff would have been required to expend that amount anyway to exercise his stock purchase option. In view of the unsatisfactory nature of the evidence about the value of the stock from time to time on and after July 1, 1966, down to January 1, 1969, the Court is not willing to allow anything on account of interest paid on that loan; nor does the Court think that Moody should be charg-

ed with Arkansas Educators' share of the "profit" on the sale of the 105,000 shares. Since plaintiff in effect consented to Moody's delay in performance, he will not be allowed anything on account of interest accruing to the Bank after July 1, 1966.

Moody's obligation was to pay $364,000. The stock sold for $261,339.70; the difference that plaintiff is entitled to recover is $102,660.30.

Plaintiff also claims that he is entitled by way of special damages to an attorney's fee of $10,000 for the benefit of the intervenors' attorneys. The parties have stipulated that the Shamburger note to the Bank called for a reasonable attorney's fee should the note be placed in the hands of an attorney for collection, that the note was so placed, and that $10,000 would be a reasonable fee.

■ Consequential damages for breach of contract are recoverable where they may be said to have been fairly within the contemplation of the parties, and it may be conceded that in a proper case where a breach of contract imposes legal expenses on the offended party in connection with litigation or prospective litigation with a third party, the offended party may recover those expenses from the individual or corporation guilty of the breach.

■ The burden is on the plaintiff to establish consequential damages, and the Court will not go beyond the stipulation of the parties. That stipulation recites that all of the notes executed by Shamburger to the Bank contained the same provision relative to an attorney's fee, but it is not stipulated that Moody was aware of that provision. While Moody knew that Shamburger owed the Bank, he did not necessarily know that the note contained a stipulation for an attorney's fee; and the Court is not willing to say that such a fee was within the contemplation of the parties when the contract was made.

■ Since plaintiff's claim against Moody became liquidated as of January

1, 1969, when the stock was finally sold, he is entitled to interest on his principal award from that date.

Judgment in accordance with the foregoing will be entered.